UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH PLISZKA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AXOS BANK, d/b/a UFB DIRECT,<br><br>Defendant. | Case No.:  24-cv-445-RSH-SBC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION OR DISMISS**<br><br>[ECF No. 10] |

Before the Court is a motion to compel arbitration or to dismiss, filed by defendant Axos Bank d/b/a UFB Direct ("UFB"). ECF No. 10. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument. For the reasons below, the Court grants in part and denies in part UFB's motion.

**I.      BACKGROUND**

The instant case is a putative class action brought by customers holding money market accounts with UFB. It is one of several related cases pending in this District. *See*

*In re Axos Bank Litigation*, 3:23-cv-2266-RSH-SBC,[1] *Kyle Ash et al v. Axos Bank*, 24-cv-01157-RSH-SBC.

The Complaint alleges Plaintiff and other UFB customers were induced into opening money market accounts advertised as earning "high yield," "exceptional" or "leading" annual percentage yields ("APYs")). ECF No. 1 ¶ 4. UFB then executed a "shell game"—creating new money market accounts offering higher interest rates to new customers, without informing its existing accountholders. *Id.* ¶¶ 6–10. Rather than increasing the APYs earned on its earlier accounts, UFB reclassified them as "legacy accounts" and, in some cases, even decreased their APYs. *Id.*

Named Plaintiff is a New York resident affected by UFB's alleged misconduct. *Id.* ¶¶ 14, 79–92. Plaintiff seeks to represent: (1) "a class of all persons who have been UFB high-yield money market accountholders since UFB began converting its money market accounts to 'legacy' accounts"; and (2) "a subclass of all persons in New York who have been UFB money market accountholders sinc[e] UFB began converting its money market accounts to 'legacy' accounts." *Id.* ¶ 97.

The Complaint brings claims for: (1) breach of the implied covenant of good faith and fair dealing; (2) violation of California's Unfair Competition Law; (3) violation of California's False Advertising Law; (4) violation of California's Consumer Legal Remedies Act; and (5) deceptive practices under New York General Business Law section 349(a). *Id.* ¶¶ 107–156.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "governs arbitration agreements in 'contract[s] evidencing a transaction involving interstate commerce.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (quoting 9 U.S.C. § 2). Pursuant to Section 2 of the FAA, arbitration agreements "shall be valid,

---

[1] The *In re Axos* case is a consolidation of the *Sutaniman v. Axos Bank*, No. 3:23-cv-2266-RSH-SBC and *Blosser v. Axos Bank*, Case 3:24-cv-259-RSH-SBC cases.

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "In deciding whether to compel arbitration under the FAA, a court's inquiry is limited to two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "If both conditions are met, 'the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms.'" *Id.*; *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

## III.   ANALYSIS

### A.   Valid Agreement to Arbitrate

The Court first considers whether a valid agreement to arbitrate to exists. *See Lim*, 8 F.4th at 999; *see Caremark, LLC v. Chickasaw Nation,* 43 F.4th 1021, 1030 (9th Cir. 2022) ("[A] court must resolve any challenge that an agreement to arbitrate was never formed[.]").

"Parties are not required to arbitrate their disagreements unless they have agreed to do so." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014). "In determining the validity of an agreement to arbitrate, federal courts should apply ordinary

state law principles that govern the formation of contracts," in this case, California law. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002) (internal quotation marks omitted); *see* ECF No. 10-2 at 55, 89.[2] The party seeking to compel arbitration "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

Two agreements are relevant to this dispute: (1) the Personal Deposit Account Agreement and Schedule of Fees ("Personal Deposit Agreement"); and (2) the Online Access Agreement. ECF No. 10-1 at 21–25. The Parties do not dispute that the Online Access Agreement Plaintiff originally entered into contains an arbitration provision, while the Personal Deposit Agreement does not. *Id.* at 16–17. Nevertheless, UFB contends both agreements were later updated to include arbitration provisions with class action waivers effective February 9, 2024. *Id.* at 19–20. In response, Plaintiff argues: (1) UFB failed to prove Plaintiff "executed or agreed" to the original Online Access Agreement; and (2) Plaintiff did not agree to the February 9, 2024 updates to the Personal Deposit and Online Access Agreements. ECF No. 12 at 20–25.

1. *Assent to Online Access Agreement*

Plaintiff argues UFB has not met its burden to show Plaintiff executed and assented to the Online Access Agreement. *Id.* at 20–21.

"[U]nder California law, mutual assent is a required element of contract formation." *Knutson*, 771 F.3d at 565. "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Caballero v. Premier Care Simi Valley LLC*, 69 Cal. App. 5th 512, 518 (Ct. App. 2021) (internal quotation marks omitted). "A party's acceptance of an

---

[2]   All citations to electronic case filing ("ECF") entries refer to the ECF-generated page numbers.

agreement to arbitrate may be express, as where a party signs the agreement." *Id.* (internal quotation marks omitted).

Under California's Uniform Electronic Transactions Act, "an electronic signature has the same legal effect as a handwritten signature." *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836, 843 (Ct. App. 2014).[3] "Still, any writing must be authenticated before the writing . . . may be received in evidence." *Id.* California "Civil Code section 1633.9 addresses how a proponent of an electronic signature may authenticate the signature—that is, show the signature is, in fact, the signature of the person the proponent claims it is." *Id.* Under section 1633.9: "An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." Cal Civ Code § 1633.9(a); *see Fabian v. Renovate Am., Inc.*, 42 Cal. App. 5th 1062, 1068 (Ct. App. 2019) ("The party seeking authentication may carry its burden 'in any manner,' including by presenting evidence of the contents of the contract in question and the circumstances surrounding the contract's execution.").

In this case, Plaintiff submitted a sworn declaration attesting he does not recall accepting the Online Access Agreement prior to opening his money market account. Declaration of Joseph Pliszka ("Pliszka Decl.," ECF No. 12-1) ¶ 4. The burden, therefore, shifts to UFB "to prove by a preponderance of the evidence that [Plaintiff's electronic] signature is, indeed, authentic." *Bulnes v. Suez WTS Servs. USA, Inc.*, No. 22-cv-1154-BAS-AHG, 2023 U.S. Dist. LEXIS 78472, at *21 (S.D. Cal. May 4, 2023).

UFB submits two declarations from Derek Tam, its "First Vice President, Software Development Manager." Declaration of Derek Tam ("Tam Decl.," ECF No. 10-2 at 1–5)

---

[3] An "electronic signature" is defined as "an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record." Cal. Civ. Code § 1633.2(h).

¶ 1; Supplemental Declaration of Derek Tam ("Suppl. Tam Decl.," ECF No. 15-1 at 1–17) ¶ 1.[4] Mr. Tam declares that since starting at UFB, he and his team have been responsible "for building, maintaining, and improving the backend software and database systems" UFB uses for: (1) account enrollment (the "Enrollment System"); (2) user verification (the "Identity System"); and (3) online banking services (the "OLB System"). Suppl. Tam Decl. ¶ 3. The three systems are used to "gather and store information about UFB's accountholders" and "are also the systems applicants and accountholders must use to obtain and use their UFB accounts." *Id.* ¶ 4.

Mr. Tam's supplemental declaration then describes the steps a new customer must take in order to: (1) open an account with UFB; and (2) sign up for online banking services. *Id.* ¶¶ 8–23. First, to open an account, a prospective customer must complete the "account opening process on UFB's website" which requires the individual to provide a "first name, last name, email, and mobile phone number" and create a "username and password." *Id.* ¶ 8. "Usernames are unique to each UFB applicant[.]" *Id.* ¶ 11. When an applicant creates a unique username, UFB's Identity System assigns the applicant a unique "UDBId"—the "identifier used by UFB in its backend systems." *Id.* ¶ 12. During the enrollment process, the applicant is also asked to provide other personal identifying information, including occupation, address, birth date, social security number, and Driver's License or State ID number. *Id.* ¶ 13. This data is "paired" with the applicant's unique username and UDBId. *Id.*

///
///
///

---

[4] Plaintiff submits a number of evidentiary objections to Mr. Tam's declaration. ECF No. 12-2. These objections are **OVERRULED**. Mr. Tam's declaration properly lays a foundation and establishes his personal knowledge of the facts stated in his declaration and the authenticity of the exhibits attached. The court does not find Mr. Tam's statements vague, argumentative, or irrelevant.

To access their account online, an accountholder must return to UFB's website (or mobile application) and login using their unique username and password. *Id.* ¶ 20. When logging in for the first time, the accountholder is presented with a "Terms & Conditions" screen:



*Id.* ¶ 20. The "Terms and Conditions" screen states at the top: "Please read and accept our Terms and Conditions." *Id.* ¶ 21. Directly below is "a copy of the Online Access Agreement that individuals can scroll through to review." *Id.* Below this is text stating the following:

> By selecting 'Agree & Continue', you consent to adhere to the Terms and Conditions as stated in the Axos Online Access Agreement. This Online Access Agreement governs your use of this site for your personal requests and transactions; and details the online policies relative to Axos Bank, Nationwide, and UFB Direct Online and Axos Invest accounts, products, services and features. Please read this Agreement carefully.

*Id.* ¶. The text is followed by an orange button reading "Agree & Continue." *Id.* ¶ 22.

According to Mr. Tam, when an accountholder clicks the "Agree & Continue" button, the OLB System "stores the date and time" the button was clicked. *Id.* "UFB knows to associate that datapoint with the accountholder because the accountholder cannot proceed to the above screen without having logged in with their unique username and password." *Id.* For these reasons, Mr. Tam declares he was able to query UFB's OLB System using Plaintiff's UBDId to confirm Plaintiff had clicked the "Agree and Continue" button on April 11, 2023 at 8:42 a.m. *Id.* ¶ 25.

The Court determines that UFB has submitted sufficient evidence authenticating Plaintiff's electronic signature. The California Court of Appeal's decision in *Espejo v. Southern California Permanente Medical Group*, 246 Cal. App. 4th 1047 (2016) is instructive. In that case, defendant submitted a declaration by its systems consultant detailing the company's "security precautions regarding transmission and use of an applicant's unique username and password, as well as the steps an applicant would have to take to place his or her name on the signature line of the employment agreement" and dispute resolution procedure. *Id.* at 1062. The consultant concluded the electronic signature could only have been placed by someone using plaintiff's "unique user name and password." *Id.* The *Espejo* Court found these details were satisfactory to "establish" the authenticity of the electronic signature. *Id.* Similarly, here, Mr. Tam's supplemental declaration describes the steps an accountholder must take to open an account with UFB and sign up for UFB's online banking services. Tam. Suppl. Decl. ¶¶ 8–23. Mr. Tam further states Plaintiff could not have accessed UFB's online banking services without first agreeing to the Online Access Agreement and this process could only have been completed by someone using Plaintiff's unique username and password. *Id.* ¶¶ 20–25.

"[T]he burden of authenticating an electronic signature is not great." *Ruiz*, 232 Cal. App. 4th at 844. UFB has met its burden here. *See Guidry v. Vitas Healthcare Corp.*, No. 3:24-cv-00176-H-MMP, 2024 U.S. Dist. LEXIS 84799, at *8 (S.D. Cal. May 9, 2024) (electronic signature authenticated where defendant provided evidence regarding transmission and use of plaintiff's username and password and steps plaintiff would have

taken to execute agreement electronically); *Beltran v. Inter-Con Sec. Sys.*, No. 2:21-cv-04927-VAP-(AFMx), 2021 U.S. Dist. LEXIS 174720, at *12 (C.D. Cal. Sep. 13, 2021) (electronic signature authenticated where defendant described hiring process in detail and clarified process "could be completed only with signer's private password"); *Tanis v. Sw. Airlines, Co.*, No. 18-cv-2333-BAS-BGS, 2019 U.S. Dist. LEXIS 38876, at *14 (S.D. Cal. Mar. 11, 2019) (electronic signature authenticated where evidence showed someone using plaintiff's username and password clicked an acknowledgement of terms box and this action "could only have been done" by plaintiff"); *Garcia v. NRI USA, LLC*, No. 2:17-CV-08355-ODW-GJS, 2018 U.S. Dist. LEXIS 130055, at *6–7 (C.D. Cal. Aug. 1, 2018) (electronic signature authenticated where the "only way" for plaintiff to access and sign arbitration agreement was using a confidential username and password).[5]

### 2. Assent to Updates

The Court next considers whether Plaintiff assented to UFB's February 9, 2024 updates to the Personal Deposit and Online Access Agreements.

Here, both the Personal Deposit and Online Access Agreements contain provisions stating UFB could add, delete, or change the terms of these agreement "at any time." ECF Nos. 10-1 at 18–19; 10-2 at 55, 63. Nevertheless, "a party with the unilateral right to modify a contract" does not have "carte blanche to make any kind of change whatsoever as long as a specified procedure is followed." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 791 (Ct. App. 1998). Nor do Parties to a contract have an "obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Douglas v. United States Dist. Court*, 495 F.3d 1062, 1066 (9th Cir. 2007). Instead, "[i]n order for changes in terms to be binding pursuant to a change-of-terms provision in the original contract, both parties to the contract—not just the drafting party—must have notice of the change in contract terms." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th

---

[5]   Notably, in his Sur-Reply, Plaintiff does not dispute the supplemental Tam declaration provides sufficient evidence of authentication. *See* ECF No. 16-1.

Cir. 2020); *see also Am. Licorice Co. v. Total Sweeteners, Inc.*, No. C-13-1929 EMC, 2013 U.S. Dist. LEXIS 114401, at *33 (N.D. Cal. Aug. 13, 2013) ("[A] modification requires the mutual assent of the parties."). The party "alleging the existence" of the contract bears the burden of proving each element of a valid contract—including mutual assent. *Stover*, 978 F.3d at 1086.

The question before the Court, then, is whether UFB has met its burden of demonstrating Plaintiff had notice of the February 9, 2024 updates to the Personal Deposit and Online Access Agreements. *Stover*, 978 F.3d at 1086 ("[N]otice—actual, inquiry, or constructive—is the touchstone for assent to a contract, and the resulting enforceability of changed terms in an agreement.").[6] Here, UFB submits evidence that it sent an e-mail with the subject line: "'Change in Terms for Online Access Agreement and Deposit Account Agreement & Schedule of Fees'… to all UFB accountholders [who] elected to have communications sent by e-mail." Suppl. Tam. Decl. ¶ 29. The e-mail informed accountholders UFB's Personal Deposit and Online Access Agreements would be updated effective February 9, 2024. ECF No. 15-1 at 107; 109. The e-mail further informed customers: (1) an arbitration provision was being inserted into the Personal Deposit Agreement; (2) the arbitration provision in the Online Access Agreement was being revised; and (3) accountholders had thirty days after the February 9, 2024 effective date to opt out of these provisions. *Id.* at 108–109. Finally, the e-mail provided a hyperlink where users could download an electronic copy of the updated agreements. *Id.* at 109–110. According to UFB's records: (1) this change-in-terms e-mail was sent to

---

[6] The Court rejects UFB's argument that case law directed to the initial formation of a contract is inapplicable here, because UFB was updating the terms of an existing contract rather than creating a new one. ECF No. 15 at 4. "[A] revised contract is merely an offer and does not bind the parties until it is accepted." *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007). For these reasons, "[a] valid modification still requires proof of the other elements essential to the validity of a contract, including mutual assent." *Pmc, Inc. v. Porthole Yachts*, 65 Cal. App. 4th 882, 887 (1998).

1  Plaintiff on January 26, 2024 at 11:47 p.m. CST; (2) Plaintiff opened the e-mail on
2  January 27, 2024 at 10:05 a.m. CST; and (3) Plaintiff did not close his money market
3  account until May 7, 2024—after the thirty day opt-out deadline had already passed.
4  Suppl. Tam Decl. ¶¶ 34, 36.

5        Plaintiff contends the fact that he may have received UFB's e-mail, opened it, and
6  then continued using his money market account without opting out is not sufficient to
7  show his agreement to these updated arbitration terms. ECF Nos. 12 at 22–25; 16-1 at
8  6–7. The Court agrees.

9        "As a general rule, 'silence or inaction does not constitute acceptance of an offer.'"
10 *Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting
11 *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1385 (Ct. App.
12 1993)). Under California law, "[a]n offer made to another, either orally or in writing,
13 cannot be turned into an agreement because the person to whom it is made or sent makes
14 no reply, even though the offer states that silence will be taken as consent, for the
15 [offeror] cannot prescribe conditions of rejection so as to turn silence on the part of the
16 offeree into acceptance." *Leslie v. Brown Bros., Inc.*, 208 Cal. 606, 621 (1929). "There
17 are several well-recognized exceptions to this rule." *Golden Eagle*, 20 Cal. App. 4th at
18 1386. "An offeree's silence may be deemed to be consent to a contract when the offeree
19 has a duty to respond to an offer and fails to act in the face of this duty." *Norcia*, 845
20 F.3d at 1284–85. "An offeree's silence may also be treated as consent to a contract when
21 the party retains the benefit offered." *Id.* at 1285.

22       Here, UFB has not adequately demonstrated that any of these exceptions apply.
23 First, there is no evidence Plaintiff "manifested his intent to use his silence, or failure to
24 opt out, as a means of accepting the arbitration agreement." *Gentry v. Superior Court*, 42
25 Cal. 4th 443, 468 (2007). For example, in *Njad*, the Ninth Circuit held an employee was
26 bound by a dispute resolution agreement when plaintiff signed an acknowledgement form
27 clearly setting out "the significance of his failure to opt out and describ[ing] in detail the
28 mechanism by which he could express his disagreement." *Circuit City Stores, Inc. v.*

*Najd*, 294 F.3d 1104, 1109 (9th Cir. 2002). Given this signed form, the *Njad* Court found it could "infer" plaintiff's assent through his silence. *Id.* Similarly, in *Gentry*, the California Supreme Court found that the plaintiff had "manifested his intent to use his silence" as "a means of accepting the arbitration agreement," where the plaintiff had signed an "easily readable, one-page form" acknowledging receipt of the agreement. 42 Cal. 4th at 468. This District's decision in *Gaines v. AT&T Mobility Servs., Ltd. Liab. Co.*, 424 F. Supp. 3d 1004 (S.D. Cal. 2019), is also persuasive. In *Gaines*, the parties disputed whether plaintiffs' failure to opt-out of an arbitration agreement sent by e-mail was sufficient to establish their consent to be bound by the agreement's terms. *Id.* at 1011. As the defendant had "failed to require and obtain" the plaintiffs' acknowledgement they had received the arbitration agreements, the court concluded "silence alone [was] insufficient to constitute consent." *Id.* at 1012. "

Similarly, in this case, absent evidence that Plaintiff acknowledged receiving the change-of-terms e-mail, the Court declines to conclude that Plaintiff manifested his intent to use silence as a means of acceptance. *See also Sifuentes v. Dropbox, Inc.*, No. 20-cv-07908-HSG, 2022 U.S. Dist. LEXIS 125273, at *11 (N.D. Cal. June 29, 2022) ("Even if the email alone could be considered 'reasonably conspicuous notice,' Plaintiff took no action to unambiguously manifest his assent.").

This is also not a case where Plaintiff's silence may be treated as consent because he "retained" the benefits of his money market account. Here, the change-in-terms e-mail clearly indicated opting out of the arbitration provision would not affect an accountholder's "other rights or responsibilities" under the agreement. ECF No. 15-1 at 108–09. Plaintiff did not, therefore, "retain" any benefit by failing to act. Instead, Plaintiff would still have been entitled to the benefit of his money market account regardless of whether he opted out of the February 9, 2024 updates or not. *See Norcia*, 845 F.3d at 1286 (plaintiff did not "retain" benefit from failing to act, where plaintiff was entitled to the benefits of a limited warranty regardless of whether he opted out of an arbitration agreement or not).

"In the absence of an applicable exception, California's general rule for contract formation applies." *Id.* at 1286. The Court concludes that Plaintiff is not bound by the updated February 9, 2024 arbitration provisions.[7]

### B.  Scope and Enforceability

Having determined that the Online Access Agreement's original arbitration provision is at issue, the Court turns to whether this provision covers Plaintiff's claims, and if so, whether it is enforceable.

Plaintiff argues the Online Access Agreement's arbitration provision "plainly governs" claims arising from use of the UFB website only, and regardless, is unenforceable because it includes a waiver of public injunctive relief and "poison pill" clause. ECF No. 12 at 15, 21–22. UFB responds, in part, that the original Online Access Agreement's arbitration provision contains a clause delegating these questions for the arbitrator. ECF No. 15 at 5–6.

---

[7]  UFB cites three cases in support of its position that where an agreement contains a change-of-terms provision, an e-mail providing notice of updated terms constitutes sufficient notice to be binding. ECF Nos. 10-1 at 22; 15 at 4. These cases are not on point and unpersuasive.

In *Stover*, the Ninth Circuit addressed the question "whether a single website visit four years after assent to a contract containing a change-of-terms provision is enough to bind the parties to terms in the then-current version of the contract of which the visitor is unaware[.]" 978 F.3d at 1085–86. The Ninth Circuit did not address whether an e-mail would constitute sufficient notice of updated terms.

*Silverman v. Move Inc.*, No. 18-cv-05919-BLF, 2019 U.S. Dist. LEXIS 105365 (N.D. Cal. June 24, 2019), supports this Court's holding that more than an e-mail is required. In *Silverman*, the e-mail that the plaintiff received was "not the only interaction" the plaintiff had with the defendant. *Id.* at *34. The plaintiff also spoke with an account executive who informed her she would be receiving "all of the details and important information" about her agreement through e-mail. *Id.* at *35. The *Silverman* Court found this admonition adequately put the plaintiff on notice. *Id.*

Finally, *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445 (W.D. Pa. 2019), analyzes contract formation and modification under Pennsylvania common law and is not relevant to the Court's analysis.

"A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all." *Caremark,* 43 F.4th at 1029. The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). However, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so[.]" *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986)). "Such 'clear and unmistakable evidence of [an] agreement to arbitrate arbitrability might include a course of conduct demonstrating assent or an express agreement to do so'—*i.e.*, a delegation clause." *Lim*, 8 F.4th at 1000 (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

Here, the arbitration provision in question states:

> You and we agree that any Covered Disputes between or among you and us, regardless of when it arose, will, upon demand by either you or us, be resolved by the arbitration process described in the Binding Arbitration and Waiver of Class Action Rights section below. You understand and agree that you and we are each waiving the right to a jury trial or a trial before a judge in a public court.

ECF No. 15-1 at 61. The provision defines a "dispute" to include "[w]hether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Provision." *Id.* Finally, the provision provides that the Parties agree "[t]he Arbitrator will decide any dispute regarding the enforceability of this Arbitration Provision." *Id.* at 62. Plaintiff has not offered any argument or legal authority as to why the delegation clause would not apply. Nor does Plaintiff offer any challenge as to the

clause's validity or enforceability.[8] Given the express language of the provision, and the lack of any argument or legal authority to the contrary, the Court holds Plaintiff must arbitrate these gateway issues before the arbitrator. *See Henry Schein,* 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").

## IV.   CONCLUSION

For the above reasons, the Court grants in part and denies in part UFB's motion as follows:

1. The Court **GRANTS** UFB's motion to compel arbitration. The Court **ORDERS** the Parties to proceed to arbitration for a determination of arbitrability and possible arbitration of Plaintiff's individual claims, in the manner provided for in the original Online Access Agreement.

2. The case is **STAYED** pending the completion of arbitration proceedings pursuant to 9 U.S.C. § 3.

3. The Parties are **ORDERED** to file a status update on their arbitration proceedings every **ninety days** and within **seven days** of completion.

4. The Court **DENIES** UFB's motion to dismiss as moot.

**IT IS SO ORDERED.**

Dated: September 13, 2024

*Robert S. Huie*
_____
Hon. Robert S. Huie
United States District Judge

---

[8] Plaintiff has forfeited such challenges by not timely raising them. *See Rent-A-Center, W., Inc. v. Jackson,* 561 U.S. 63, 75–76 (2010); *Holley-Gallegly v. TA Operating, LLC,* 74 F.4th 997, 1003 n.3 (9th Cir. 2023); *Steward v. Kemper Corp.,* No. 5:23-cv-02312-SSS-SPx, 2024 U.S. Dist. LEXIS 130522, at *4 (C.D. Cal. June 4, 2024).